UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard Ray LACEY, Defendant–
Appellant.

No. 94–3317.

United States Court of Appeals,
Tenth Circuit.

June 11, 1996.

James E. Flory, Assistant United States Attorney, Topeka, Kansas (Randall K. Rathbun, United States Attorney, Topeka, Kansas, with him on the brief), for Plaintiff/Appellee.

Marilyn M. Trubey, Assistant Federal Public Defender, Topeka, Kansas (David J. Phillips, Federal Public Defender, Topeka, Kansas, with her on the brief), for Defendant/Appellant.

Before EBEL, LOGAN, and BRISCOE, Circuit Judges.

EBEL, Circuit Judge.

Appellant Richard Ray Lacey ("Lacey") appeals from his convictions and sentence on various drug-related offenses. On appeal, Lacey complains that: (1) the district court erred in not granting a downward departure from the Sentencing Guidelines based on the government's alleged "sentencing factor manipulation"; (2) the court erroneously enhanced Lacey's offense level based on his role in the offense; (3) the court abused its discretion in refusing to grant a mistrial based on improper statements made during voir dire; (4) the court erred in refusing to instruct the jury on the lesser included offense of simple possession; (5) the court erred in admitting certain items of evidence seized during a warrantless search of Lacey's vehicle; (6) the court abused its discretion in denying Lacey's motion to dismiss based on his compelled testimony before the grand jury; and (7) evidence of flight was improperly admitted at trial. We have jurisdiction under 28 U.S.C. § 1291 and we now affirm.

## BACKGROUND

Lacey was convicted after a jury trial of six counts of a seven count indictment, including one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846, three counts of distribution of approximately 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (aiding and abetting), one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (aiding and abetting), and one count of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (aiding and abetting).

Lacey was previously tried and convicted of the same charges *in absentia* after failing to appear at the first day of his jury trial in February 1990. Lacey was later appre-

hended in Florida and brought back to Wichita, Kansas, where he pleaded guilty to a charge of failure to appear. 18 U.S.C. § 3146(a)(1). After sentencing, Lacey appealed his drug convictions and the resulting sentence. This Court rejected Lacey's appeal as to his convictions, but remanded the case for resentencing. *United States v. Lacey,* 969 F.2d 926 (10th Cir.1992). Lacey then filed a Petition for Certiorari in the United States Supreme Court challenging the *in absentia* convictions. The Supreme Court granted the writ and vacated the judgment, remanding the case to this Court for further consideration in light of *Crosby v. United States,* 506 U.S. 255, 113 S.Ct. 748, 122 L.Ed.2d 25 (1993), a case decided earlier that term.[1] *Lacey v. United States,* 507 U.S. 901, 113 S.Ct. 1233, 122 L.Ed.2d 640 (1993). The panel, in turn, remanded Lacey's case to the district court with instructions to vacate the judgment and proceed in accordance with *Crosby. United States v. Lacey,* 990 F.2d 586 (10th Cir.1993).

The evidence adduced at Lacey's second trial included the following: In February 1989, F.B.I. agents in Wichita, Kansas arrested an individual named Kelly Coley on federal drug charges. Following his arrest, Coley entered into a cooperation agreement with the government whereby he agreed to make drug purchases from certain individuals suspected of trafficking narcotics in the Wichita area. Specifically, Coley was enlisted to attempt drug purchases from Lee Ray Harper, Mary Friesen, and their suspected supplier, Appellant Richard Ray Lacey.

Beginning in April 1989, Coley made several contacts with Harper and Friesen. On April 4, 1989, Coley visited Harper at his home and inquired about making a 500 gram purchase of cocaine from Lacey. Harper told Coley that Lacey would not sell the drugs personally, but advised him to contact Friesen in order to make arrangements for the sale, which Coley did later that day. On the evening of April 6, 1989, Coley met with Friesen at her residence and purchased 500 grams of cocaine. Earlier that evening,

F.B.I. surveillance units had observed both Lacey and Friesen in the parking lot of a local shopping center.

Coley made similar half-kilogram purchases from Friesen on May 17 and May 23, 1989. Prior to the first transaction on May 17, 1989, F.B.I. agents conducting surveillance followed Friesen to the home of Lacey's girlfriend, Laura Klobuchar. Less than an hour later, Lacey arrived at Klobuchar's house carrying a brown paper sack. After a few minutes inside, Lacey and Friesen both emerged from the house. Friesen was carrying a dark shoulder bag, and Lacey was no longer carrying the paper sack. Friesen then left Klobuchar's house and drove directly to the Airport Hilton in Wichita, where she met Coley and sold him 500 grams of cocaine.

On May 22, 1989, Coley again contacted Friesen for the purpose of purchasing a half-kilogram of cocaine. After several conversations, Coley and Friesen agreed to meet at the Marriott Hotel in Wichita to carry out the deal. On May 23, 1989, shortly before the agreed upon meeting between Coley and Friesen, surveillance agents observed Lacey drive to a farm near Udall, Kansas. After approximately one hour at the farm, Lacey left the area. After departing the farm, Lacey traveled down several gravel roads before briefly meeting up with another vehicle. Lacey then proceeded to a convenience store, where he was met by Friesen. Surveillance agents saw Lacey enter Friesen's car, where he remained for several minutes. After Lacey exited Friesen's car, Friesen drove directly to the Marriott hotel in Wichita, where she sold 500 grams of cocaine to Coley.

After the May 23, 1989 cocaine buy from Friesen, Coley was instructed by the F.B.I. to attempt to make a larger multi-kilogram purchase of the drug. Pursuant to this instruction, Coley contacted Friesen on June 14, 1989, to arrange a purchase of six kilograms of cocaine. After several face-to-face meetings and telephone conversations, Coley and Friesen made an agreement for the purchase of approximately four to six kilograms of cocaine. On July 5, 1989, Friesen told

1. In *Crosby,* the Supreme Court ruled that Federal Rule of Criminal Procedure 43 "prohibits the trial *in absentia* of a defendant who is not pres-

ent at the beginning of trial." 506 U.S. at 262, 113 S.Ct. at 753.

Coley that she had spoken with Lacey and that Lacey had the cocaine. Friesen then told Coley that the deal could be completed later that day.

Shortly after this conversation, F.B.I. surveillance agents observed Lacey drive his van to a parking lot in Wichita. Several minutes later, Friesen arrived in another car, exited her vehicle, and stepped into Lacey's van. Friesen exited the van six minutes later and drove away. Lacey was later seen driving to the same farm near Udall, Kansas. While at the farm, Lacey drove his van to a clearing and parked at the edge of a wooded area. The van remained there for about ten minutes before leaving the farm and heading back in the direction of Wichita. The van was next seen heading north on a country road, where it met up with the car driven by Friesen. At this point, the F.B.I. agents arrested Lacey and Friesen. A search of Friesen's car yielded a black bag containing approximately five kilograms of cocaine. The agents also found a small quantity of cocaine, a pager, and a few thousand dollars cash in Lacey's van.

A search warrant later was obtained for the farm house in Udall, now identified as belonging to an individual named Mitcheal Edmonson. The agents executing the warrant followed a trail from the farmhouse to the clearing where Lacey earlier had parked his van. The agents located an area of the ground which appeared to have recently been excavated and discovered a ten gallon cooler filled with cocaine about 12 inches below the ground. Another cooler containing approximately seven kilograms of marijuana was also found buried nearby. Based on this evidence, Lacey was found guilty of conspira-

cy to distribute cocaine, three counts of distribution of cocaine, possession with intent to distribute cocaine, and possession with intent to distribute marijuana. Lacey was sentenced to 240 months on the conspiracy charge. Lacey was also sentenced to terms of 240 months each on the cocaine charges, and 120 months on the marijuana charge, all to be served concurrently with one another.

## DISCUSSION

### I. Departure Below the Sentencing Guidelines

■ We first address Lacey's argument that the district court erred in failing to depart downward from the guideline range based on the government's "sentence factor manipulation." Legal conclusions under the sentencing guidelines are reviewed under the *de novo* standard, while factual determinations made by the district court are reviewed for clear error. *United States v. Diggs,* 8 F.3d 1520, 1526 (10th Cir.1993).[2]

Lacey maintains that the district court improperly included in its base offense level calculation ten additional kilograms of cocaine (consisting of the five kilograms seized from Mary Friesen's vehicle the night of Lacey's arrest and five additional kilograms found during the subsequent search of the Edmonson Farm).[3] Specifically, Lacey asserts that these amounts should have been excluded from the sentencing calculus because the government unnecessarily continued its undercover investigation after it already possessed sufficient evidence to secure the arrest and conviction of Lacey and his coconspirators. According to Lacey, the gov-

---

2. The government argues that this Court lacks jurisdiction to review a discretionary refusal to depart below the sentencing guidelines. While the government is correct that we will not review a district court's *discretionary* choice not to depart downward, *see Diggs,* 8 F.3d at 1526, there is no similar impediment to appellate review where a sentence is imposed (as Lacey argues) in violation of law, or as a result of an incorrect application of the guidelines. *See* 18 U.S.C. § 3742(a); *United States v. Bromberg,* 933 F.2d 895, 896 (10th Cir.1991); *accord United States v. Montoya,* 62 F.3d 1, 3–4 (1st Cir.1995) (holding similar sentencing defense reviewable on appeal).

3. The district court calculated Lacey's base offense level on a quantity of 11,493.3 grams of cocaine and 2,178 grams of marijuana. These quantities were converted to 2,300.84 kilograms of marijuana using the drug equivalency table found at U.S.S.G. § 2D1.1, comment. (n.10). Based on this conversion, the district court assigned a base offense level of 32. U.S.S.G. § 2D1.1(c)(4). Exclusion of the ten kilograms of cocaine would result in a quantity of approximately 300.84 kilograms of marijuana applying the drug equivalency tables. This figure would result in a base offense level of 26. *See* U.S.S.G. § 2D1.1(c)(7).

ernment's decision to continue the investigation and to negotiate a multi-kilogram purchase of cocaine was for the sole purpose of increasing his punishment under the sentencing guidelines. Lacey relies on a number of cases from other circuits recognizing a similar defense under the rubric of either "sentencing entrapment" or "sentencing factor manipulation." *See, e.g., United States v. Staufer,* 38 F.3d 1103, 1106 (9th Cir.1994) ("sentencing entrapment"); *United States v. Rogers,* 982 F.2d 1241, 1245 (8th Cir.) (same), *cert. denied,* 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 706 (1993); *United States v. Connell,* 960 F.2d 191, 194 (1st Cir.1992) ("sentencing factor manipulation"). *But see United States v. Williams,* 954 F.2d 668, 673 (11th Cir.1992) (rejecting "sentence entrapment" theory as a viable defense).

■ This Circuit never has addressed squarely a defense claim of "sentencing factor manipulation" under that rubric.[4] However, we have addressed the same concept under the appellation of "outrageous governmental conduct." *See United States v. Mosley,* 965 F.2d 906, 908, 914 (10th Cir.1992). The outrageous conduct defense recognized in *Mosley* generally prevents the government from prosecuting a crime developed

through egregious investigatory tactics. *Id.* at 908 ("When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct."). However, in *Mosley* we also suggested that sufficiently egregious government conduct may affect the sentencing determination. *Id.* at 914 (addressing defendant's claim that the government's outrageous conduct was designed to " 'ratchet[ ] up' the severity of the transaction for purposes of sentencing"). Thus, we believe that arguments such as Lacey's, whether presented as "sentencing factor manipulation" or otherwise, should be analyzed under our established outrageous conduct standard. *Accord United States v. Messino,* 55 F.3d 1241, 1256 (7th Cir.1995) (applying outrageous governmental conduct standard and declining to adopt a special "sentence manipulation" defense).[5]

### A. The Standard for Outrageous Conduct

■ The defense of outrageous conduct has its origin in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), where the Supreme Court suggested in dicta that "we may some day be presented

---

**4.** A sentencing "entrapment" defense was raised in *United States v. Bara,* 13 F.3d 1418, 1420 (10th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 1662, 128 L.Ed.2d 378 (1994), but was not addressed, as the defendant had not developed any facts to support such a claim. More recently, in *United States v. Hardwell,* 80 F.3d 1471, 1498 (10th Cir.1996), the defendant argued that he was a victim of "sentencing entrapment" because the government, in a reverse sting operation, induced him to purchase a greater quantity of cocaine by selling it at a below-market price. We rejected this argument, concluding that the price offered by the government for the cocaine appeared reasonable. *Id.*

**5.** As noted, the term "sentencing entrapment" also has been employed to describe the defense now asserted by Lacey. However, the use of this term is unfortunate as it tends to blur the distinction between the defense of "true" entrapment and that of outrageous conduct. As we explained in *Mosley,* "[t]he defense of outrageous conduct is distinct from the defense of entrapment in that the entrapment defense looks to the state of mind of the defendant to determine whether he was predisposed to commit the crime for which he is prosecuted. The outrageous conduct defense, in contrast, looks at the government's behavior." 965 F.2d at 909 (citations

omitted). Because Lacey's challenge focuses on the allegedly egregious investigatory tactics of the *government* and makes no claim that he was not predisposed to sell the drugs, Lacey's argument is more properly labeled "outrageous conduct." *See United States v. Jones,* 18 F.3d 1145, 1152–53 (4th Cir.1994) (noting that where the defendant is predisposed to commit the crime, a "sentencing entrapment" argument is more closely akin to an outrageous conduct defense); *United States v. Cotts,* 14 F.3d 300, 306 n. 2 (7th Cir.1994) (rejecting sentencing entrapment argument because the defendant did not argue "that he lacked a predisposition to buy multiple kilogram amounts of cocaine and that his will was overborne by unrelenting government persistence," but leaving open the possibility of a defense based on outrageous conduct). In any event, we believe that the analogy to entrapment at the sentencing phase is misplaced, for once a defendant crosses "the reasonably bright line between guilt and innocence, ... a defendant's criminal inclination has already been established, and the extent of the crime is more likely to be a matter of opportunity than of scruple." *United States v. Montoya,* 62 F.3d 1, 4 (1st Cir. 1995).

with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643. Because of the "difficulties attending the notion that due process of law can be embodied in fixed rules," *id.* at 431, 93 S.Ct. at 1642, courts recognizing the outrageous conduct defense have not attempted to attach a precise definition to its requirements. *See, e.g., United States v. Bogart,* 783 F.2d 1428, 1435 (9th Cir.) ("[N]o federal court has defined with any sort of precision the contours of the outrageous conduct defense."), *vacated in part on other grounds sub nom. United States v. Wingender,* 790 F.2d 802 (9th Cir.1986). Rather, the relevant inquiry is whether, considering the totality of the circumstances in any given case, the government's conduct is so shocking, outrageous and intolerable that it offends "the universal sense of justice." *Mosley,* 965 F.2d at 910 (quoting *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643).

 Since our decision in *United States v. Spivey,* 508 F.2d 146 (10th Cir.), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975), we have recognized the viability of the outrageous conduct defense;[6] however, neither in that case nor in any case since have we been presented with government conduct sufficiently egregious to warrant a dismissal. *See Diggs,* 8 F.3d at 1524 ("This court has never rendered an opinion holding that governmental conduct constitutes outrageous conduct."). The absence of any decision by this court upholding such a claim does not suggest that the defense is unavailable, but merely bears testament to its narrow scope. *See Mosley,* 965 F.2d at 910 (outrageous conduct is "an extraordinary defense reserved for only the most egregious circumstances").

 The strict nature of the outrageous conduct inquiry is due in primary part to the reluctance of the judiciary to second-guess the motives and tactics of law enforce-

ment officials. *See Hampton v. United States,* 425 U.S. 484, 495–96 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring in judgment) (enforcement officials "must be allowed flexibility adequate to counter effectively [narcotics] activity"). Government involvement is essential in the context of sting operations, which are often the only effective way to detect and to develop proof of illegal drug activity. To be sure, there is a point at which excessive government zeal may warrant judicial intervention. However, prior to that point, the courts will not fine tune conduct of law enforcement officials that does not "offend the universal sense of justice." *See Russell,* 411 U.S. at 435, 93 S.Ct. at 1644 (expressing concern over giving the judiciary a " 'chancellor's foot' veto over law enforcement practices of which it did not approve"). *See also United States v. Shephard,* 4 F.3d 647, 649 (8th Cir.1993) (refusing "to fashion a code of conduct for sting operations"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1322, 127 L.Ed.2d 671 (1994).

### B. Evaluating the Government's Conduct

 Lacey's principal complaint is that the July 5, 1989 purchase of approximately five kilograms of cocaine negotiated by Kelly Coley, the government's confidential informant, was carried out for no reason other than to increase the quantity of drugs involved and thereby enhance the severity of his punishment. Lacey argues that immediately following the third controlled half-kilogram purchase on May 23, 1989, everything necessary to discover the stash location and effectuate the eventual arrest of Lacey and his coconspirators was known to law enforcement officials.

The government, on the other hand, sets forth several reasons for its continued investigation of Lacey. First, F.B.I. surveillance of Lacey on July 5, 1989 (the date of his arrest), enabled the government to determine the precise location of the drug stash on the Edmonson Farm. Although the government's agents had observed Lacey at the

---

**6.** Most of the other federal circuits have also recognized the viability of this defense. *See Mosley,* 965 F.2d at 909 (collecting cases). *But see United States v. Tucker,* 28 F.3d 1420, 1422–27 (6th Cir.1994) (rejecting outrageous governmental conduct defense), *cert. denied,* —— U.S. ——, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995).

Edmonson Farm previously, it was only on this later occasion that the agents were able to detect the location of the underground coolers containing the larger quantities of cocaine and marijuana. Absent this further investigation, the stash location may have remained undiscovered.

█ Moreover, as the government points out, until July 5, 1989, the F.B.I. had no direct evidence placing the cocaine in Lacey's possession. Prior to that point, the agents possessed only circumstantial evidence consisting of surveillance of Lacey meeting with his coconspirators under suspicious circumstances; yet, there was no clear evidence of an exchange of drugs or contraband during these meetings. The government's basis for seeking to gather additional evidence was to strengthen its case against Lacey. Law enforcement officials are entitled to buttress their cases with additional evidence, and the courts will not usurp the prosecutor's role in deciding when a particular case is strong enough to seek an indictment. *See United States v. Baker*, 63 F.3d 1478, 1500 (9th Cir.1995) ("[T]he government ... must be permitted to exercise its own judgment in determining at what point in an investigation enough evidence has been obtained."), *cert. denied*, ── U.S. ──, 116 S.Ct. 824, 133 L.Ed.2d 767 (1996).

The government also notes that Lacey was not the only target of its investigation. Although the arrest of Lacey was admittedly a primary goal, the agents assigned to the case also sought to compile enough evidence to break up Lacey's drug ring and secure the conviction of all of his coconspirators. This is a legitimate law enforcement purpose. *See United States v. Egemonye*, 62 F.3d 425, 427–28 (1st Cir.1995) (noting that "additional and larger transactions" were appropriate in order to identify defendant's coconspirators). Lacey argues that the government already possessed evidence strong enough to accomplish this goal on May 23, 1989, prior to the multi-kilo purchase. However, Lacey's argument is undermined by the fact that two of his alleged coconspirators, Laura Klobuchar and Lee Ray Harper, were acquitted of all charges after a jury trial. These acquittals suggest, contrary to Lacey's assertion, that the evidence against Klobuchar and Harper was, if anything, not strong enough.

█ Nor do we find fault with the government's decision to seek a "bigger buy" from Lacey's distributor, Mary Friesen. We have previously held that it is not outrageous for the government to induce a defendant to continue criminal activity "or even to induce him to expand or extend previous criminal activity." *Mosley*, 965 F.2d at 911 (citing *United States v. Cantwell*, 806 F.2d 1463, 1468–69 & n. 3 (10th Cir.1986)). Law enforcement officials are often justified in increasing the scope of criminal activity in a sting operation, especially when attempting to ensnare those persons higher up on the distribution ladder who are ultimately responsible for the supply of drugs. *See United States v. Doyle*, 60 F.3d 396, 398 (8th Cir.1995) ("By asking [the confidential informant] to arrange a controlled buy of a substantial quantity of crack cocaine, the agents would have some assurance that [the informant] was in fact identifying a more culpable supplier."), *cert. denied*, ── U.S. ──, 116 S.Ct. 538, 133 L.Ed.2d 443 (1995). We agree with the reasoning of the Eighth Circuit on this point:

> Obviously, any transaction in a sting after the first violation of law, however minor, will be subject to ["sentence manipulation"] attacks. Yet, we have established that it is legitimate for police to continue to deal with someone with whom they have already engaged in illicit transactions in order to establish that person's guilt beyond a reasonable doubt or to "probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy."

*Shephard*, 4 F.3d at 649 (quoting *United States v. Calva*, 979 F.2d 119, 123 (8th Cir. 1992)). Moreover, we believe that the ultimate seizure of a larger quantity of illegal drugs from a suspect in connection with the arrest has positive societal consequences; eradicating illegal drugs from society is a legitimate, if not the primary, goal of drug enforcement officials.

Lacey directs our attention to, and urges us to follow, *United States v. Staufer*, 38 F.3d

1103 (9th Cir.1994). In *Staufer,* the defendant was convicted for selling 10,000 doses of "LSD" (lysergic diethamide acid) to an undercover government agent. The evidence at trial showed that earlier offers for much smaller amounts of LSD were refused by the agent, and that the purchase price was sweetened in order to overcome Staufer's reluctance in going through with the larger transaction. *Id.* at 1105.[7] The district court's findings indicated that Staufer was a user and infrequent seller of LSD, but that his sales were only made on a very small level to his personal friends. *Id.* at 1108. He had never engaged in a sale even close in size to the one for which he was convicted. *Id.* Based on these findings, the Ninth Circuit ruled 2–1 that Staufer was a victim of "sentencing entrapment," and remanded to the district court for resentencing. *Id.*[8]

Lacey's case is clearly distinguishable. Unlike *Staufer,* the district court here made no findings suggesting that Lacey was merely a small-time user who sold his drugs, if at all, only in small quantities to personal friends. Nor was there any evidence adduced at trial showing that Lacey was reluctant to go through with the larger multi-kilo transaction. On the contrary, the factual recitation in Lacey's own brief indicates that immediately after the government's confidential informant inquired about purchasing the six kilograms of cocaine, the informant was told by Lacey's distributor that it "would not be a problem." Br. of Appellant at 8. Moreover, the record is replete with evidence showing that Lacey dealt in large quantities of cocaine and marijuana. On the night of his arrest, for example, Lacey was seen driving his vehicle to the very spot where several kilograms of cocaine and marijuana were unearthed. This evidence sharply conflicts with Lacey's depiction of himself as a small-time user. Thus, we cannot say that the government's conduct in this case was so outrageous as to " 'overcome[ ] the will of an individual predisposed only to dealing in small quantities.' " *Staufer,* 38 F.3d at 1106 (quoting *United States v. Lenfesty,* 923 F.2d 1293, 1300 (8th Cir.), *cert. denied,* 499 U.S. 968, 111 S.Ct. 1602, 113 L.Ed.2d 665 (1991)).

■ Because of our concerns about curtailing the government's discretion in fighting crime, and bearing in mind the *ad hoc* nature of the due process inquiry, we decline, as Lacey essentially asks us, to fashion a bright line rule prescribing the point at which the government must cease its investigation and arrest targeted criminals. Moreover, we agree with the government that its continued investigation of Lacey following the half-kilogram purchase on May 23, 1989 was in furtherance of legitimate law enforcement objectives and not, as a matter of law, outrageous. We are aware that the sentencing guidelines present opportunities for unscrupulous law enforcement officials to continue an undercover investigation for the sole purpose of ratcheting up the punishment that ultimately will be meted out to the target.[9] However, "[w]hile we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles" would warrant a downward departure from the sentencing guidelines, *cf. Russell,* 411 U.S. at 431, 93 S.Ct. at 1642–43, today is not that day.

---

**7.** Moreover, at the time of the government's sting operation, the defendant was in serious financial trouble. Having recently been robbed, beaten and hospitalized, he was unable to pay either his bills or rent, and he was living in a garage. *Staufer,* 38 F.3d at 1105.

**8.** The Ninth Circuit is the only circuit we know of that has sustained a sentencing defense similar to that raised by Lacey. In addition to the sentencing entrapment theory adopted in *Staufer,* the Ninth Circuit has affirmed a district court's decision to depart downward on the basis of what it called "imperfect entrapment." *United States v. McClelland,* 72 F.3d 717, 724–26 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct.

1448, 134 L.Ed.2d 567 (1996). *Cf. United States v. Naranjo,* 52 F.3d 245, 251 (9th Cir.1995) (noting the strong possibility that the government increased the quantity of drugs purchased by the defendant solely to increase his sentence and remanding to the district court for resentencing).

**9.** The Sentencing Commission also appears to be cognizant of this potential for abuse. *See* U.S.S.G. § 2D1.1, comment. (n.17) (indicating that a downward departure may be warranted where, in a reverse sting, government agents set an artificially low price on a controlled substance in order to permit an otherwise unable buyer to go through with the transaction).

## II. Sentence Enhancement Based on Role in the Offense

Lacey also challenges the district court's imposition of a four-level enhancement based on his role in the offense as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Lacey contends, first, that he did not assume an organizational or leadership role in the offense; and second, that the relevant criminal activity did not involve five or more participants.

▮▮▮▮ In order to justify an enhancement based on a defendant's role in the offense, the sentencing court must make specific factual findings as to that role. *United States v. Roberts*, 14 F.3d 502, 522 (10th Cir.1993). We review these factual findings for clear error, giving deference to the district court's application of the sentencing guidelines to the facts. *United States v. Torres*, 53 F.3d 1129, 1142 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2599, 132 L.Ed.2d 845 (1995). However, questions of law regarding the application of the guidelines are reviewed *de novo. Roberts*, 14 F.3d at 523. The four level enhancement prescribed by § 3B1.1(a) of the guidelines can be imposed only if the sentencing court finds that: (1) the defendant is an organizer or leader; and (2) the relevant criminal activity involved five or more participants or was otherwise extensive. *Torres*, 53 F.3d at 1142 (quoting *Roberts*, 14 F.3d at 523). We believe the district court's findings as to both of these requirements are supported by the record and thus are not clearly erroneous.

▮▮▮▮ In order to characterize the defendant as an "organizer or leader" for purposes of guideline § 3B1.1(a), we have held that certain threshold elements of control or organization must be present. *United States v. Roach*, 978 F.2d 573, 576 (10th Cir.1992). Specifically, the defendant "must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime." *United States v. Reid*, 911 F.2d 1456, 1464 (10th Cir.1990), *cert. denied*, 498 U.S. 1097, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991). The guidelines specify several factors that the sentencing court should consider in determining whether the defendant occupied an organizational or leadership role, including:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4). These factors are intended only to guide the analysis of the sentencing court, and the guidelines do not require that each be satisfied for § 3B1.1 to apply. *United States v. Bernaugh*, 969 F.2d 858, 863 (10th Cir.1992).

▮▮▮▮ The district court specifically found that Lacey was an organizer or leader for purposes of § 3B1.1(a). The court based this finding on information gleaned from the presentence report, the testimony at trial, and numerous tape recordings of conversations between the government's confidential informant and Lacey's coconspirators. The tape recordings reveal that Lacey directed his intermediaries, including Mary Friesen and Lee Ray Harper, to arrange the various drug transactions for him. Lacey himself controlled the quantity and timing of the sales, as well as the price to be paid for the drugs. In one taped conversation, Friesen is heard telling the government informant that because of Lacey's additional "transportation costs" (*i.e.*, smuggling costs), the price of the cocaine was going up. Friesen also admits several times on tape that she had previously smuggled cocaine for Lacey into Kansas from California. Finally, Lacey is the person who had access to the secret stash location on the Edmonson farm, thus showing that he controlled the supply of drugs to the entire criminal operation. Applying these facts to the criteria set forth in the guidelines, we believe the district court did not clearly err in finding by a preponderance of the evidence that Lacey was an "organizer or leader" for purposes of § 3B1.1(a).

As to the "five or more participants" requirement of § 3B1.1(a), the district court specifically identified four individuals in addition to Lacey who were participants in the criminal activity: Mary Friesen, Mitcheal Edmonson, Laura Klobuchar, and Lee Ray Harper. However, Lacey contends that because Klobuchar and Harper were acquitted after a jury trial, the district court erred when it included them as participants under § 3B1.1(a).

The Sentencing Commission has defined a participant as "a person who is criminally responsible for the commission of the offense, *but need not have been convicted.*" U.S.S.G. § 3B1.1, comment. (n.1) (emphasis added). Although the guidelines clearly do not require a conviction to confer participant status, Lacey asks us to read the emphasized language as referring only to unindicted co-conspirators, and not to those persons acquitted by a jury. Thus, Lacey argues, the criminal enterprise should not have included Harper and Klobuchar, who, by virtue of their acquittals, could not have been "criminally responsible" within the meaning of § 3B1.1(a). We disagree.

Lacey's unique interpretation of § 3B1.1(a) is without precedential support in this Circuit and is contrary to at least the general principles announced in some of our prior decisions. In *United States v. Washington,* 11 F.3d 1510, 1516 (10th Cir.1993), *cert. denied,* ─── U.S. ───, 114 S.Ct. 1404, 128 L.Ed.2d 76 (1994), for instance, we upheld the district court's enhancement of the defendant's sentence based upon evidence of certain drug quantities, even though the defendant was not convicted of these additional amounts. 11 F.3d at 1516. Underlying our analysis in *Washington* was the premise that although certain evidence may not suffice to establish criminal liability under the reasonable doubt standard, that same evidence may nevertheless support a sentence enhancement under the less rigorous preponderance standard. *See also United States v. Saro,* 24 F.3d 283, 286 n. 3 (D.C.Cir.1994) ("[A] sentencing court may include even acquitted offenses as 'relevant conduct'; a judge may well determine that the government has proved an offense by a preponderance of the evidence ... even though the jury concluded that the offense had not been proven beyond a reasonable doubt."). The majority of circuits now adhere to the principle that criminal conduct for which a person has been acquitted may nevertheless form the basis for a sentence enhancement. *See United States v. Kelly,* 1 F.3d 1137, 1139 n. 1 (10th Cir.1993) ("All circuits except the Ninth permit the sentencing court to consider the facts underlying an acquittal in upwardly departing or enhancing a sentence.") (collecting cases).

This reasoning applies with equal force to Lacey's case—that is, even though a jury did not find Klobuchar and Harper guilty beyond a reasonable doubt, the district court was not foreclosed from finding by a preponderance of the evidence that they were "criminally responsible" and thus participants in Lacey's drug conspiracy. Because the district court's findings on this point were not clearly erroneous, we do not disturb its imposition of a four-level enhancement for Lacey's role in the offense.

### III. Refusal to Grant a Mistrial Based on Jury Taint

Lacey argues that the district court erred in failing to grant his motion for a mistrial after a potential juror made certain allegedly prejudicial remarks in the presence of the other venirepersons. "A ruling on a motion for mistrial is within the sound discretion of the district court and will not be disturbed absent a clear abuse of that discretion." *United States v. Wacker,* 72 F.3d 1453, 1466 (10th Cir.1995) (citing *United States v. Berryhill,* 880 F.2d 275, 278 (10th Cir.1989), *cert. denied,* 493 U.S. 1049, 110 S.Ct. 853, 107 L.Ed.2d 846 (1990)).

In response to questioning from the court during voir dire, one potential juror indicated that his opinion of the defendant's guilt would be affected if the defendant did not take the stand and proclaim his innocence. When asked if this belief would affect his ability to render an impartial verdict, the juror replied that it would.[10] The district

---

10. The following exchange took place between the court and the potential juror:

court promptly dismissed the juror for cause, yet two other jurors questioned immediately thereafter expressed similar opinions regarding the defendant's decision not to testify. One of these two jurors was excused for cause and the other was excused by way of defendant's peremptory challenge. At this point in the proceedings, Lacey moved for a mistrial. The trial court denied the motion and instructed the jury as follows:

> The fact that a defendant did not take the stand and testify in his own behalf does not create any presumption against him. You are charged that you must not permit that fact to weigh in the slightest degree against him nor should it enter into your discussions or deliberations in any manner.

(R.O.A. Vol. X, p. 321.) The court then inquired whether any of the jurors would have difficulty following this instruction. None of the jurors responded affirmatively. Because Lacey did not testify at trial, the court issued the instruction again at the close of the case.

▮▮▮▮ When improper or prejudicial remarks are made by one venireperson and heard by other venirepersons during the jury selection process, we have held that "the test of juror impartiality is whether 'the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *Wacker*, 72 F.3d at 1467 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961)). While it is true that the three excused jurors demonstrated some degree of bias against a defendant who would not testify, the partiality of the petit jury is evaluated in light of those persons ultimately empaneled and sworn, not those who are excused from service. *United States v. McIntyre*, 997 F.2d 687, 698 n. 7 (10th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 736, 126 L.Ed.2d 699 (1994). The trial judge believed that the cautionary instruction given to the remaining

> THE COURT: And, of course, the defense doesn't have to do anything in regard to the prosecution of the case.
> JUROR: That's my problem, sir.
> THE COURT: You would require the defendant to introduce some evidence?
> JUROR: Him not wanting to take the stand, I'm sorry, that would shed a very dark light on his case.
> THE COURT: That would influence you even though I would instruct you that you are

venirepersons was sufficient to cure any possible prejudice against the defendant. The court also took the additional step of questioning the potential jurors in order to be certain that its instructions were heeded. "Because the district court is in the best position to judge the effect of improper statements on a jury and the sincerity of the jurors' pledge to abide by the court's instructions, its assessment is entitled to great weight." *Wacker*, 72 F.3d at 1467–68 (citing *United States v. Gibbons*, 607 F.2d 1320, 1330–31 (10th Cir.1979); *United States v. Tegzes*, 715 F.2d 505, 508–09 (11th Cir.1983)). After reviewing the record, we do not believe that the district court abused its discretion by denying Lacey's request for a mistrial.

### IV. Lesser–Included Offense Instruction

▮▮▮▮ Lacey next assigns as error the district court's refusal to instruct the jury on the lesser-included offense of simple possession of cocaine. We have held that an instruction on a lesser-included offense is required only when all of the following elements are satisfied: (1) there has been a proper request; (2) the lesser-included offense must consist of some, but not all, of the elements of the offense charged; (3) the elements differentiating the two offenses must be a matter in dispute; and (4) a jury must be able rationally to convict the defendant of the lesser offense and acquit of the greater offense. *United States v. Martinez*, 979 F.2d 1424, 1433 (10th Cir.1992), *cert. denied*, 507 U.S. 1022, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993). Applying the *Martinez* four-part test, the district court concluded that Lacey was not entitled to the lesser-included offense instruction because he failed to make the requisite showing as to parts three and four of the test. We agree.[11]

> not to regard that in any way whatsoever in regard to the issues that are submitted to you? Would you follow that instruction?
> JUROR: Sir, I would have to say in the deepest part of my heart, if the man can't say he's not guilty, then something is wrong.

(R.O.A. Vol. IX, p. 285.)

**11.** Lacey requested the lesser-included offense instruction on the counts charging distribution

Because the district court applied the proper standard, "we review for abuse of discretion '[t]he decision of whether there is enough evidence to justify a lesser included offense charge.'" *United States v. Abeyta*, 27 F.3d 470, 473 (10th Cir.1994) (quoting *United States v. Chapman*, 615 F.2d 1294, 1298 (10th Cir.), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2947, 64 L.Ed.2d 827 (1980)) (alteration in original). As an initial matter, we note that there is no dispute as to the first two parts of the *Martinez* test. The record indicates that Lacey requested an instruction from the district court on the charge of simple possession, and it is well-settled that the offense of possession with intent to distribute consists of all the elements of simple possession, *plus* the requirement that the defendant possess the intent to distribute the drug to others. *United States v. Burns*, 624 F.2d 95, 104 (10th Cir.) (citing *United States v. Brischetto*, 538 F.2d 208, 209–10 (8th Cir.1976)), *cert. denied*, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980). The parties' real differences arise with respect to the third and fourth prongs of the *Martinez* analysis. Lacey argues that because only a small quantity of cocaine was found in his van when he was arrested, it was a matter of dispute at trial whether he possessed the requisite intent to distribute. Accordingly, Lacey argues, a rational jury could have convicted him of simple possession and returned an acquittal on the more serious charge of possession with intent to distribute. By contrast, the government argues, and the district court agreed, that the quantities of cocaine attributable to Lacey were not a matter of dispute, and thus the jury could not rationally have convicted Lacey of the lesser charge while acquitting him of the greater. The government also argues that there was direct evidence that Lacey supplied drugs to coconspirators specifically for distribution.

We agree that the evidence presented at trial leaves no dispute that Lacey possessed significant quantities of drugs such that no rational jury could have convicted him of simple possession. Even assuming that only user quantities of cocaine were seized from Lacey's van and residence, the evidence clearly connects Lacey with the cocaine seized from Mary Friesen's vehicle, as well as the cocaine and marijuana seized from the stash location on the Edmonson Farm. F.B.I. surveillance agents observed Lacey visiting the underground stash location just minutes before his arrest. A subsequent search of this location yielded five kilograms of cocaine and more than two kilograms of marijuana. These significant amounts do not support an instruction for simple possession. *Cf. Fitzgerald v. United States*, 719 F.2d 1069, 1070 (10th Cir.1983) (25 grams of cocaine and 33 grams of amphetamine too significant to support an instruction of simple possession).

Lacey's argument is also undermined by the fact that he was charged with aiding and abetting the distribution of cocaine. *See* 18 U.S.C. § 2(a). After listening to the taped conversations between Mary Friesen and the government informant, there can be no dispute that multiple quantities of cocaine were in fact distributed. There is also little doubt that Friesen intended to distribute at least four kilograms of cocaine to the government informant on the evening of her arrest. To the extent that Lacey is charged as aiding or abetting the commission of these crimes, he is punishable as a principal to those crimes and thus may be held accountable for the quantities of drugs involved. *See* 18 U.S.C. § 2(a). Thus, the district court did not err in refusing Lacey's request to give such an instruction.

## V. Legality of the Automobile Search

Lacey next argues that the district court erred in denying his motion to suppress evidence seized during a warrantless search of his van. Lacey was arrested by the F.B.I. on July 5, 1989 as he met with Mary Friesen

---

(Counts 2, 3 and 4) and the counts charging possession with intent to distribute (Counts 6 and 7). Lacey did not request a similar instruction on the conspiracy count charged in Count 1, nor could he—possession of a controlled substance is not a lesser-included offense of conspiracy to possess a controlled substance. *United States v. Horn*, 946 F.2d 738, 744 (10th Cir.1991) (holding that possession, possession with intent to distribute, and distribution are not lesser included offenses of conspiracy to commit these same offenses).

on a dirt road outside Wichita, Kansas. After arresting Lacey, the F.B.I. agents searched the interior of Lacey's van and seized a small amount of cocaine, a pager, and a few thousand dollars in cash. The district court concluded that the evidentiary items were seized pursuant to a valid automobile search incident to arrest. *See New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). On appeal, Lacey argues that the district court erred in this conclusion.[12]

In reviewing a denial of a pretrial suppression motion, we accept the factual findings of the district court unless they are clearly erroneous, and we consider the evidence in the light most favorable to the government. *United States v. Morgan*, 936 F.2d 1561, 1565 (10th Cir.1991), *cert. denied*, 502 U.S. 1102, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992). The ultimate determination of reasonableness under the Fourth Amendment is, however, a conclusion of law which is reviewed *de novo*. *Ornelas v. United States*, — U.S. —, —, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).

In *Belton*, the Supreme Court held that a police officer may conduct a contemporaneous warrantless search of the passenger compartment of a vehicle incident to a lawful arrest. 453 U.S. at 460, 101 S.Ct. at 2864. In creating this bright line rule for automobiles, the Court reasoned that "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m].'" *Id.* (quoting *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969)) (alteration in original). Lacey contends that because he had been handcuffed and placed on the ground at the time of the search, and because the door to his van was closed, there was no threat that he would reach inside the vehicle for a weapon or to destroy evidence. Thus, Lacey argues, the rationale for a search incident to

arrest did not exist, and the resulting warrantless search of the van was unreasonable.

We have previously held that where an officer has made a lawful arrest of a suspect in an automobile, the officer may seize items of evidence found within the passenger compartment of the vehicle as part of a search incident to a lawful arrest, even when the suspect is outside of the vehicle and handcuffed. *United States v. McKinnell*, 888 F.2d 669, 672–73 (10th Cir.1989); *United States v. Cotton*, 751 F.2d 1146, 1148 (10th Cir.1985). Thus, we must reject Lacey's argument that the district court erred in failing to suppress the fruits of the vehicle search. Because the agents in this case effectuated a lawful arrest of Lacey, no warrant was required under our case law to contemporaneously search the passenger compartment of his van.

## VI. Motion to Dismiss Based on Testimony Before the Grand Jury

Lacey also appeals the district court's failure to grant his motion to dismiss on the ground that his compelled testimony before the grand jury tainted any future prosecutions resulting from that compelled testimony. We review for abuse of discretion the district court's ruling on a motion to dismiss an indictment. *United States v. Strayer*, 846 F.2d 1262, 1265 (10th Cir.1988).

In exchange for a grant of use immunity, Lacey was ordered to testify before the grand jury in July 1992. Lacey's testimony was compelled after Lacey was convicted *in absentia* at his first trial, but *prior* to the Supreme Court's reversal of that conviction and remand for retrial in 1993. Lacey now argues that his Fifth Amendment right against self-incrimination was violated at his retrial because the district court did not adequately determine whether the government's evidence on retrial was obtained independent of his compelled testimony, or whether his compelled testimony influenced the trial testimony of the government's witnesses.

---

12. Lacey does not dispute the lawfulness of his arrest. Rather, he argues only that the subsequent search of his van was unreasonable.

The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V, cl. 3. In order to balance this fundamental right against the government's need to obtain information through subpoenaed testimony, Congress has authorized the grant of use immunity to those persons ordered to testify before a grand jury. *See* 18 U.S.C. § 6002.[13] Thus, once a defendant shows that he or she has been compelled to testify under a grant of use immunity about a matter relevant to his or her prosecution, the burden then shifts to the government to demonstrate that " 'all of the evidence it proposes to use was derived from legitimate independent sources.' " *Grand Jury Subpoenas Dated December 7 and 8 v. United States,* 40 F.3d 1096, 1101 n. 4 (10th Cir.1994) (quoting *Kastigar v. United States,* 406 U.S. 441, 461–62, 92 S.Ct. 1653, 1665–66, 32 L.Ed.2d 212 (1972)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995).

In the typical case involving use immunity, it is common for the district court to conduct a *"Kastigar* hearing" to determine whether a defendant's compelled testimony was used in violation of the defendant's right against self-incrimination. *Grand Jury Subpoenas,* 40 F.3d at 1101 n. 4. However, in this case, the government represented to the district court that its presentation on retrial would involve exactly the same witnesses as Lacey's first trial, and the government also offered the transcript of the first trial as a comparative means of evaluating whether any of Lacey's compelled grand jury testimony was in fact "used" in violation of his right against self-incrimination. *See United States v. Pantone,* 634 F.2d 716, 721 (3d Cir.1980) ("The earlier trial, and its trial transcript, constitute the wholly independent source for any evidence adduced at the retrial that *Kastigar* de-

mands."); *United States v. Borello,* 624 F.Supp. 150, 153 (E.D.N.Y.1985) ("[I]n light of the availability of the transcript from the prior trial, and based on the prosecutor's representations, [the court] conclude[s] that the government has met its burden under *Kastigar.*"). Moreover, although Lacey broadly asserts that any future prosecutions would be "tainted" by his forced appearance before the Grand Jury, he has not made any specific allegation that the government actually "used" his testimony, either directly or indirectly, so as to require the district court to conduct a full-blown *Kastigar* hearing. *Cf. United States v. North,* 920 F.2d 940, 944 (D.C.Cir.1990) ("If the prosecutor were to demonstrate ... that the witness had set down his story before exposure [to the immunized testimony], then the burden of going forward would shift to the defendant to challenge that version."), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

Importantly, the government in the present case also adopted a further precautionary measure by erecting a so-called "Chinese Wall" between those persons who were exposed to Lacey's grand jury testimony and those who were not. *See United States v. Schwimmer,* 882 F.2d 22, 26 (2d Cir.1989) (noting that on retrial, government should establish a "Chinese Wall" to bar all those persons exposed to the grand jury testimony from participation in the case), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990). Specifically, the government in Lacey's retrial denied its witnesses all access to Lacey's compelled testimony. It also assigned a different prosecutor to Lacey's case, one who had neither participated in nor been exposed to the grand jury proceedings. In light of the prophylactic measures taken by the government, the availability of the transcript from Lacey's first trial, and the failure of Lacey to allege

---

**13.** The use immunity statute, 18 U.S.C. § 6002, reads in relevant part as follows:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

 (1) a court or grand jury of the United States

 . . .

and the person presiding over the proceeding communicates to the witness an order issued under this title, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case. . . .

any specific direct or indirect use of his compelled testimony, we cannot say that the district court abused its discretion either by failing to conduct a *Kastigar* hearing, or by denying Lacey's motion to dismiss the indictment.[14]

## VII. Evidence of Flight

■ Lacey's final argument is that the district court erred in admitting evidence of flight. Lacey failed to appear on the first day of his initial trial in February 1990 and was apprehended approximately one year later by a Deputy United States Marshal in Miami, Florida. Prior to trial, the government filed a notice of intent to introduce evidence of Lacey's flight. Lacey responded by filing a motion *in limine* seeking to prohibit the introduction of this evidence. The district court denied Lacey's motion and Lacey now appeals that ruling.

■ The decision whether to admit evidence of the defendant's flight at trial is a matter within the discretion of the trial court. *United States v. Martinez*, 681 F.2d 1248, 1258 (10th Cir.1982). Because flight evidence carries with it "a strong presumption of admissibility," we will reverse the district court's ruling only upon a showing of an abuse of that discretion. *Id.* at 1256, 1258 (citing *Allen v. United States*, 164 U.S. 492, 499, 17 S.Ct. 154, 156–57, 41 L.Ed. 528 (1896)).

■ Lacey argues that the evidence of flight should have been excluded because of the time delay between his arrest and his flight from the jurisdiction. In support of this argument, Lacey cites *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977), as establishing an "immediacy requirement" for the introduction of flight evidence. *Myers* holds that "[t]he more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other

than feelings of guilt concerning that offense." 550 F.2d at 1051. As a general matter, we do not quarrel with this observation. However, we believe that evidence of flight that occurs in close temporal proximity to other significant events in the course of a prosecution (such as the commencement of trial) also may be probative of the defendant's guilt. *See, e.g., United States v. Dillon*, 870 F.2d 1125, 1127–28 (6th Cir.1989) (evidence of flight admissible where it appeared that defendant fled after learning that coconspirator would implicate him); *United States v. Hernandez–Miranda*, 601 F.2d 1104, 1107 (9th Cir.1979) (evidence of flight admissible where defendant fled a few days prior to his scheduled jury trial). There is no dispute that Lacey fled on the eve of his first trial in this matter. Because this fact is probative of Lacey's guilt of the offenses charged, we believe the district court did not abuse its discretion in admitting evidence of Lacey's flight.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

14. Lacey also contends that he was prevented from testifying at his second trial out of fear that he subsequently would be prosecuted for perjury. This argument has no merit. First, because Lacey never testified at trial, his fears of a subsequent prosecution are largely hypothetical. Second, and most importantly, Lacey cannot assert the grant of immunity as a shield against a perjury prosecution. *See* 18 U.S.C. § 6002. As the Supreme Court has stated, "the Fifth Amendment 'does not endow the person who testifies with a license to commit perjury.'" *United States v. Apfelbaum*, 445 U.S. 115, 127, 100 S.Ct. 948, 955, 63 L.Ed.2d 250 (1980) (quoting *Glickstein v. United States*, 222 U.S. 139, 142, 32 S.Ct. 71, 73, 56 L.Ed. 128 (1911)).