UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ROQUE DIAZ,

      Defendant-Appellant.

No. 98-2120

ORDER
Filed October 15, 1999

Before **BRORBY, EBEL** and **HENRY** , Circuit Judges.

Appellant's petition for rehearing is denied.

The suggestion for rehearing en banc was transmitted to all of the judges of the court who are in regular active service as required by Fed. R. App. P. 35. As no member of the panel and no judge in regular active service on the court requested that the court be polled, the suggestion is also denied.

Appellant's motion to file a reply to the response to the petition for rehearing is denied.

Footnote number three of the slip opinion filed on August 27, 1999, is deleted. A corrected opinion is attached to this order.

Entered for the Court
PATRICK FISHER, Clerk of Court


By:    Keith Nelson
       Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 27 1999**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

ROQUE DIAZ,

     Defendant-Appellant.

No. 98-2120

**Appeal from the United States District Court**
**for the District of New Mexico**
**(Cr. No. 97-227 JP)**

Lissa J. Gardner, Assistant Federal Public Defender (Ann Steinmetz, Federal Public Defender, with her on the briefs), Las Cruces, New Mexico, for Defendant-Appellant.

Jason Bowles and Fred Joseph Federici, III, Assistant United States Attorneys (John J. Kelly, United States Attorney, Renee L. Camacho, Assistant United States Attorney on the briefs), Albuquerque, New Mexico, for Plaintiff-Appellee.

Before **BRORBY, EBEL** and **HENRY** , Circuit Judges.

**HENRY** , Circuit Judge.

Mr. Roque Diaz appeals his conviction following a jury trial for attempt to possess with intent to distribute more than 500 grams of cocaine, a violation of 21 U.S.C. § 846. He argues that: (1) his due process rights were violated by the procedures of the District of New Mexico that resulted in five judges hearing various portions of his case; (2) the district court should have dismissed his charges based upon "outrageous government conduct"; (3) the court abused its discretion by excluding the testimony of his expert witness; and (4) the court improperly failed to grant a downward departure. We affirm the judgment of the district court, holding that no due process violation, outrageous government conduct, or abuse of discretion in the exclusion of testimony has been shown, and that we have no jurisdiction to review the denial of downward departure.

**FACTS**

Defendant-appellant Mr. Roque Diaz was arrested on March 6, 1997, following a "reverse sting" operation, in which law enforcement officers working undercover portray themselves as drug dealers. A videotape recorded Drug Enforcement Administration (DEA) Special Agents Steve Woodson and Kurt Nelson, along with New Mexico State Police Agent Clifford Frisk consummating the "sale" of cocaine to Mr. Diaz in a motel room.

The agents had become aware of Mr. Diaz's involvement in a drug distribution scheme after the arrest of Jose Antonio Legon, who informed the

agents that he had supplied marijuana to Mr. Diaz on two earlier occasions. Mr. Legon pled guilty to charges filed against him and agreed to cooperate with the government. In January of 1997, Mr. Legon informed Agent Woodson that "Lorenzo Roque" was interested in purchasing at least five kilograms of cocaine; he further provided a telephone and pager number for "Roque." The DEA issued an administrative subpoena for the pager number and learned that it was subscribed to by Mr. Roque Diaz. Utilizing Mr. Diaz's social security number, the DEA determined that he had a 1991 conviction in Oregon on two counts of distribution of cocaine. See Rec. vol. V, at 34-37.

On January 15, 1997, Agent Nelson called the pager number provided by Mr. Legon for "Lorenzo Roque," and Mr. Diaz answered. They discussed the price of a kilogram of cocaine. Mr. Diaz then called Agent Nelson on January 16, 1997 to say that he wanted Agent Nelson to take five kilograms of cocaine to Portland. On January 21, 1997, Mr. Diaz asked Agent Nelson to "front" him two kilograms of cocaine, i.e., to provide the cocaine while allowing Mr. Diaz to pay later. They had two more conversations, and Mr. Diaz paged Agent Nelson three times.

On February 8, 1997, Mr. Diaz told Agent Nelson he had no money and that he would contact him later, when the situation changed. On Feb. 20, 1997, Agent Nelson called Mr. Diaz again, but Mr. Diaz repeated that he had no money. On February 25, Mr. Diaz asked Agent Nelson if he could exchange jewelry for

cocaine. Agent Nelson suggested Mr. Diaz come to El Paso, assuring Mr. Diaz that they could work something out, and that Agent Nelson would help Mr. Diaz get the drugs back to Portland. They had six additional conversations. Mr. Diaz arrived in El Paso on March 6, having purchased a ticket at his own expense. Agent Woodson met Mr. Diaz at the airport and drove him to Las Cruces. They discussed how to get the cocaine to Portland, and Mr. Diaz asked if someone could mail it.

After Mr. Diaz arrived in the motel room, Agent Frisk brought the cocaine. Mr. Diaz inspected it with a knife provided by Agent Frisk. Mr. Diaz never gave the agents any money: the agents stated that they would mail the $100,000 worth of cocaine, and Mr. Diaz agreed that he would pay for it in eight days. Mr. Diaz instructed Agent Nelson to send the cocaine to his uncle, so the Agent re-packaged it, and left the motel room with the cocaine. Other law enforcement officers then arrested Mr. Diaz.

Mr. Diaz was arraigned in the United States District Court in Las Cruces, New Mexico, on April 7, 1997. He was represented by the Federal Public Defender's office in Las Cruces. On May 7, 1997, the district court adopted a new policy of handling cases, under which a different district judge from Albuquerque sits in Las Cruces each month. Because of this rotating assignment system, four different judges from the District of New Mexico ruled on Mr. Diaz's pretrial motions. The trial was conducted by the Honorable Adrian Duplantier, a

visiting judge from the Southern District of Louisiana. Judge Martha Vazquez from the District of New Mexico conducted the sentencing proceedings.

During the trial, Judge Duplantier excluded expert testimony offered by Mr. Diaz as to Mr. Diaz's subnormal mental functioning. He reasoned that Mr. Diaz had provided insufficient notice, the district court could not compel the government to agree to a telephonic witness, and the report was irrelevant.

At sentencing, Judge Vazquez ruled that the court did not have authority to depart downward based on sentencing entrapment, diminished mental capacity, or a combination of those factors when there was a statutory minimum in place. Thus, she sentenced Mr. Diaz to 120 months imprisonment, followed by an eight-year period of supervisory release.

## DISCUSSION

### I.     DUE PROCESS AND JUDICIAL ASSIGNMENT

Mr. Diaz first argues that the assignment of five district judges to handle various portions of his case violated his due process rights under the Fifth Amendment. The alleged violation of Mr. Diaz's due process rights is a legal question that we examine with de novo review. See United States v. Nichols, 169 F.3d 1255, 1267 (10th Cir. 1999).

Mr. Diaz argues that the assignment procedure is not authorized by rule or order, and that, even if the district court had the authority to adopt the procedure,

- 5 -

judicial efficiency is an improper purpose to justify rotating judicial assignments. We are persuaded by neither argument.

Mr. Diaz's challenge to the district court's authority to adopt the procedure is undermined by 28 U.S.C. § 137, which vests the district court with broad discretion in assigning court business to individual judges. It provides that "[t]he business of a court having more than one judge shall be divided among the judges as provided by the rules and orders of the court." Further, Fed. R. Crim. P. 57(b) provides that when there is no controlling law, "[a] judge may regulate practice in any manner consistent with federal law, these rules, and local rules of the district."

In light of this discretion in managing court business, we agree with the Fifth Circuit that: "[d]istrict judges may by <u>rule</u>, <u>order</u> <u>or</u> <u>consent</u> transfer cases between themselves . . . . Each judge of a multi-district court has the same power and authority as each other judge. . . . Moreover, the District Judges have the inherent power to transfer cases from one to another for the expeditious administration of justice." <u>United States v. Martinez</u>, 686 F.2d 334, 338 (5th Cir. 1982) (quoting <u>United States v. Stone</u>, 411 F.2d 597, 598 (5th Cir. 1969)) (emphasis added).

We are not persuaded by Mr. Diaz's suggestion that the absence of a written policy or order renders the rotating assignment system invalid. It is obvious that the judges of the district in question regularly show up for work, and they seem to

- 6 -

balance their assignments systematically, in all likelihood so that their more voluminous regular dockets in their resident chambers can proceed as efficiently as possible, given the necessity of traveling to other courthouses. In supplemental briefing, the government provided a letter from the Chief Deputy Clerk for the District of New Mexico confirming the rotation policy. The letter states that: "[w]e have no order or formal document setting forth the monthly rotation of District Judges in Las Cruces," but that the rotation "was discussed and agreed to by all the Judges at a Judges' Meeting," and that "[c]alendar coordination is worked out among Judges and case managers." Aple Supp. Br., Ex. 2. The government also provided an order from the Chief Justice of the United States Supreme Court appointing Judge Duplantier to perform judicial duties in the District of New Mexico during the period of March 31, 1997 to December 31, 1997, which includes the time period of Mr. Diaz's trial. As transfers may occur both by order and by consent, the District of New Mexico was authorized to adopt the rotating assignment system through an agreement at a judges' meeting. [1]

We are similarly unpersuaded by Mr. Diaz's contention that it is improper to justify the use of a rotating assignment system on the grounds of judicial efficiency. This argument fails as courts have long considered judicial efficiency a proper justification for transferring cases between judges. See Martinez, 686

---

[1] According to Judge Vazquez, the Federal Public Defender's office suggested this rotation system to the judges. See Rec. vol. VII, at 8.

F.2d at 338 (approving judicial transfer to promote "the expeditious administration of justice"); cf. Cruz v. Abbate, 812 F.2d 571, 574 (9th Cir. 1987). Mr. Diaz also apparently argues with the district judges as to whether their system is actually efficient. With all respect, the judges need to be the ones that make that call.

Finally, Mr. Diaz contends that because Fed. R. Crim. Pro. 25 addresses judicial reassignment only in cases of death, sickness, or other disability, these are the only permissible reasons to authorize a transfer from the judge initially assigned to a case. This argument also fails because it ignores the broad grant of power to courts under 28 U.S.C. § 137 to devise a system for dividing court business among judges. The provision of Rule 25 for reassignment in instances of judicial incapacity in no way circumscribes the scope of that broad administrative authority.

Thus, we hold that the goal of judicial efficiency and convenience is not an improper basis for a system of judicial assignment, and Mr. Diaz has not shown that the assignment procedure utilized by the District of New Mexico is constitutionally impermissible. [2] Nor has he shown (as discussed further below

---

[2]At oral argument, the court advised counsel for Mr. Diaz that the Judicial Council for the Tenth Circuit has the power to order that a district judge reside and conduct court in a particular town, and that counsel might petition the Judicial Council to do so. See 28 U.S.C. § 134 ("If the public interest and the nature of the business of a district court require that a district judge should

(continued...)

- 8 -

with respect to Mr. Diaz's substantive claims) that this system of judicial selection affected the fairness of the proceeding in any way. Therefore, we find no due process violation.

## II. OUTRAGEOUS GOVERNMENT CONDUCT

Mr. Diaz also argues that the district court erred in denying his motion to dismiss the indictment based upon outrageous government conduct. After reviewing the parties' motions, the district court denied Mr. Diaz's motion tersely, stating, "I find the motion and memorandum to be more entertaining than most but also find that it is without merit and will be denied." Rec. vol. I, doc. 19.

"Defendants have the burden of proving outrageous government conduct, . . . and we review this issue de novo," United States v. Pedraza, 27 F. 3d 1515, 1521 (10th Cir. 1994) (citations omitted), with factual findings reviewable under the clearly erroneous standard. United States v. Bonanno, 852 F. 2d 434, 437 (9th Cir. 1988). The terseness of the district court order, and the lack of citation by either party to the record, will assist us in making sure that our review is de novo.

---

[2](...continued)
maintain his abode at or near a particular place for holding court in the district or within a particular part of the district the judicial council of the circuit may so declare and may make an appropriate order.").

The defendants have a very high hurdle to clear: "The outrageous conduct defense . . . is an extraordinary defense that will only be applied in the most egregious circumstances. In order to prevail, the defendant must show that the challenged conduct violated notions of 'fundamental fairness' and is 'shocking to the universal sense of justice.'" Pedraza, 27 F.3d at 1521 (quoting United States v. Harris, 997 F.2d 812, 816 (10th Cir. 1993)) (citations omitted). The Pedraza court goes on to note in a footnote that "we have never issued an opinion overturning a criminal conviction on the ground of outrageous government conduct." Id. at n.3.

Indeed, our circuit is not alone in its non-utilization of this doctrine. As the Sixth Circuit noted in United States v. Tucker, 28 F.3d 1420, 1426 (6th Cir. 1994):

> In sum, there is no binding Supreme Court authority recognizing a defense based solely upon an objective assessment of the government's conduct in inducing the commission of crimes. Non-binding dicta of the Court, indicating that there may be such a defense, has been recanted by its author based upon reasoning later adopted by a majority of the Court in United States v. Payner, 447 U.S. 727, 737 n. 9 (further citation omitted). Moreover, this court has recognized the availability of this defense only in dicta because, in every case in which the issue has been raised, the government's conduct has been held not to have been "outrageous." The only case squarely holding that an objective assessment of the government's conduct in a particular case may bar prosecution without regard for the defendant's predisposition [ United States v. Twigg, 588 F.2d 373 (3d Cir. 1978), cited extensively by Mr. Diaz] has been greatly criticized, often distinguished and, recently, disavowed in its own circuit.

- 10 -

In considering this argument, we are not as sanguine as the government, nor even as literary or mythical. See Rec. vol. I, doc. 16, at 23 ("this court should similarly reject the outrageous government conduct defense as a chimera or unicorn – often hunted but never taken into captivity"). We note that the disaffection with the doctrine does not yet indicate its total impossibility. Rather, as Justice Powell noted in Hampton v. United States, 425 U.S. 484 (1976), while rejecting the plurality's conclusion that neither due process principles nor supervisory powers could support a bar to conviction in any case where the Government is able to prove predisposition:

> I emphasize that the cases, if any, in which *proof of predisposition* is not dispositive will be rare. Police overinvolvment in crime would have to reach a demonstrable level of outrageousness before it could bar conviction.

Hampton, 425 U.S. at 495 n.7 (Powell, J., concurring) (emphasis added).

In the present case, the evidence indicates that Mr. Diaz contacted the informant, that the agents confirmed his previous drug involvement, that Mr. Diaz made numerous calls to the agents, and that he decided to fly to El Paso at his own expense to obtain the drugs. He examined the cocaine, tasted it, and cut it into bricks. He directed the shipping.

Although Mr. Diaz argues that the agents "fronted" the cocaine to him, the evidence reveals that he requested that accommodation. See Rec. vol. V, at 82-83. Numerous cases stand for the proposition that supplying drugs or money or

- 11 -

equipment or even all of these does not give rise to outrageous conduct violative of due process. See United States v. Mosley, 965 F.2d 906, 913 (10th Cir. 1992) (no outrageous conduct although defendant alleged price was coercively low, agent suggested buying cocaine instead of marijuana and offered to front four additional ounces, when defendant approached agents, indicated he had dealt before, and accepted offer to buy); United States v. Asibor, 109 F.3d 1023, 1039 (5th Cir. 1997) (no outrageous conduct "even if the government agents both supplied the drugs to defendants and then bought them back with government funds") (internal quotation omitted); United States v. Evans, 941 F. 2d 267, 270 (5th Cir. 1991) (no outrageous conduct although defendant alleged "DEA agents approached him and offered to help him manufacture drugs, phoned him to pursue the arrangement, supplied the expertise, sold [him] the equipment, and supplied the laboratory site"); United States v. Cannon, 88 F.3d 1495, 1506 (8th Cir. 1996) (no outrageous conduct when defendants accused government agents of "selling them a machine gun when they had not specifically asked for one").

Mr. Diaz argues that he broke off conversation with the agents because he had insufficient funds, yet the testimony revealed that he tried to pay for drugs with jewelry, and again, that he utilized his own funds to fly to El Paso to meet with the agents to buy drugs. See Rec. vol. V, at 66; id. at vol. I, doc. 84, exhibit 4A, at 12-14. In fact, Mr. Diaz initiated the conversation in which he offered to

put up jewelry as collateral for the drugs by paging the agent.    See Rec. vol. V, at 66.

In conclusion, the evidence in this case clearly shows that Mr. Diaz was predisposed to commit this crime.  The government actions taken in the reverse sting operation do not establish the rarely available defense of outrageous government conduct.

## III.  EXCLUSION OF DR. THOMPSON'S TESTIMONY

Mr. Diaz argues that the district court erred in failing to allow him to present expert testimony on his entrapment defense.  Judge Duplantier granted the government's motion to exclude the telephonic testimony of Dr. Thomas Thompson, Ph.D., a neuropsychologist who was unable to attend the scheduled trial, because:  (1) Mr. Diaz did not provide timely notice, (2) telephonic testimony was not appropriate, and (3) the proffered testimony was irrelevant. See Rec. vol. VI, at 7-8.  Judge Duplantier also denied Mr. Diaz's motion for a continuance in order to produce Dr. Thompson in person at trial.  We consider these rulings in turn.

First, we review Judge Duplantier's exclusion of expert testimony for an abuse of discretion.    Compton v. Subaru of America, Inc.    , 82 F.3d 1513, 1517-18 (10th Cir. 1996).  Fed. R. Crim. Pro. 12.2(b) requires:

> If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of guilt, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk.

The rule further provides: "[i]f there is a failure to give notice when required by subdivision (b) of this rule . . . , the court may exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's guilt." Fed. R. Crim. Pro. 12.2(d).

Here, Mr. Diaz did not provide timely notice: his counsel gave written notice of her intent to introduce expert testimony on October 27, 1997, approximately five months after the time for filing motions had expired. Although counsel for Mr. Diaz argues she was not aware of the need to have Mr. Diaz evaluated by an expert until August of 1997, she points to no evidence in the record to support her assertion. Thus, Judge Duplantier did not abuse his "broad discretion" in excluding the testimony because it was untimely. United States v. McLernon, 746 F.2d 1098, 1115 (6th Cir. 1984) ("district judge has wide discretion to excuse appellants' failure to grant timely notice of their expert's testimony, but also has broad discretion to exclude such testimony"). Because we decide it was not an abuse of discretion to exclude the testimony based on untimely notice alone, we need not address the second and third stated grounds for excluding Dr. Thompson's testimony.

- 14 -

Alternatively, Mr. Diaz argues that even if his notice was untimely, under the circumstances of this case the court should have granted what would have been the fourth continuance so that he could properly prepare and actually produce his expert witness. The court denied his renewed motion for a continuance on the grounds that the motion was made too late in the course of the trial without justification.

We review the denial of a motion for continuance of trial for abuse of discretion and "will find error only if the district court's decision was arbitrary or unreasonable and materially prejudiced the defendant." United States v. Simpson, 152 F.3d 1241, 1251 (10th Cir. 1998). In determining whether a denial of a motion for continuance is arbitrary or unreasonable, we consider various factors, including:

> (1) the diligence of the party requesting the continuance; (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; (4) the need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance.

United States v. Wynne, 993 F.2d 760, 767 (10th Cir. 1993) (quoting United States v. West, 828 F.2d 1468, 1469 (10th Cir. 1987)).

An evaluation of these factors supports our conclusion that the district court did not abuse its discretion. First, Mr. Diaz's counsel was neither diligent in seeking the examination of Mr. Diaz nor in providing notice of her intent to call

Dr. Thompson. Counsel was appointed for Mr. Diaz on March 7, 1997, but she did not seek a continuance related to mental condition as an element of his defense until October 27, 1997. Although counsel states she was not aware of the need for having Mr. Diaz evaluated until August of 1997 and suggests that the reasons for not requesting the evaluation until then were contained in a motion that had been granted by Judge Parker, that motion is not included in the record, and she does not provide other cites to the record to substantiate her claim. Thus, we are unable to evaluate her statement upon this record. Further, while Mr. Diaz's counsel had requested a prior continuance in August to have Mr. Diaz evaluated, that unopposed request was based on her "serious concerns regarding Mr. Diaz's competency to proceed to trial," Rec. vol. I, doc. 32, at 2 (emphasis added), not in order to introduce a defense to his guilt.

The second Wynne factor (the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance) also presents problems for Mr. Diaz. Although the continuance was sought to allow Dr. Thompson to testify as to Mr. Diaz's susceptibility to entrapment, Dr. Thompson's proffered testimony did not speak clearly to Mr. Diaz's susceptibility:

> The overall pattern in the testing is one which is consistent with an
> individual who shows a moderate degree of cognitive compromise. The
> pattern is not one that suggests that this has been acquired. Rather, I would
> suggest that he has always had these difficulties. These difficulties are of
> the type which tend to produce a rather inadequate or faulty reasoning and

which more than likely have been the source of much of his inability to perform adequately, i.e., his judgment appears to be poor, he does not learn well utilizing feedback from the environment and he has problems in both organizing and planning. His verbal skills are higher and I would suspect this creates difficulty for him in the sense that his ambitions and perceptions of himself are probably much greater than he is actually able to accomplish in a genuine, day-to-day problem-solving type of situation and, based upon his history, this would certainly seem to be the case.

He is an individual who is quite immature and relatively simplistic in many ways. His difficulty in gestaltic integration and nonverbal functions would make him an extremely poor judge of people and someone who would be quite a poor judge of interpersonal situations and not likely to take into account the type of details that one would need to take into account to be successful in the majority of life's more complex endeavors.

Rec. vol. I, doc. 82, Ex. 3, at 5-6. This evidence, though arguably relevant, is not strong or conclusive of culpability-negating mental capacity. Thus, a continuance would not necessarily have materially aided Mr. Diaz.

The third Wynne factor (inconvenience) also weighs against Mr. Diaz. The court had already granted one pre-trial continuance and two continuances during trial, and a jury had been selected.

As to the fourth factor (the need for the continuance and the harm resulting from its denial), we note that before Mr. Diaz moved for the fourth continuance, the judge had already properly ruled the testimony excludable based on the lack of timely notice. Accordingly, Mr. Diaz would not have been able to introduce the testimony in any case, so that there was no prejudice. Thus, this factor also cuts against Mr. Diaz.

Therefore, we hold that Mr. Diaz has not shown an abuse of discretion in the district court's failure to admit evidence as untimely under Fed. R. Crim. P. 12(d); further, Mr. Diaz has not shown an abuse of discretion in the district court's refusal to grant a fourth continuance.

## IV.    REFUSAL TO CONSIDER A DOWNWARD DEPARTURE

We move now to Mr. Diaz's last argument – that the court erred in refusing a downward departure.  First, Mr. Diaz argues that the district court had not adequately familiarized itself with the transcript.  He states:

> Judge Vazquez had not presided over most of Mr. Diaz's pretrial proceedings and she did not preside over his trial. The record of the sentencing hearing clearly shows she was not familiar with the complete record of the case, but rather had reviewed only parts of it before proceeding to sentencing.  If Mr. Diaz had been sentenced by a judge who was fully familiar with all aspects off his case, he would have received a lesser sentence because the judge would have recognized he was predisposed, at worst, to deal in only ounces – rather than kilograms – of cocaine.

Aplt's Br. at 25.

The record, however, tells a different story, reflecting a judge frustrated with last minute submissions by both parties, but who had read the relevant transcript, in both English and Spanish, and further read all of the materials presented to her:

> THE COURT: I have a preliminary matter for counsel.  This is a huge case. I got a bunch of stuff at the last minute.  This case has been scheduled for sentencing since November, and then it has been rescheduled month after month.  It was scheduled last week and then it was rescheduled for this

- 18 -

week. I think it is inexcusable, all of the late filings there have been in this case. I do not appreciate it. I should like to indicate to counsel that if you want a judge to fully consider your brief, then please provide that to the judge with the sentencing briefs and all of the transcripts way in advance. I was not the trial judge in this case originally, so I had to read all of the transcripts that were submitted. That was a significant amount of reading. If you want me to take my time and give it thought, then it is inexcusable for me to have received such big stacks of pleadings in this case at the last minute. I have reviewed every piece of paper that you have given me, but I was not the [trial] judge, as you recall. So I was not there when the Government presented evidence that there was an issue in dispute with regard to the amount. That is a critical issue with regard to sentencing, and I think that your late filings are just inexcusable. This should not happen again.

. . . .

I have reviewed, in addition to [the presentence report, Mr. Diaz's objections and motion for downward departure, and the government's objections], something else that I need to continue and make sure Mr. Diaz has had a chance to review this. There was an addendum to the Presentence Report. Have you reviewed that with your attorney?

THE DEFENDANT: Yes, ma'am.

THE COURT: Actually, is there just one addendum? OK. Mr. Diaz, in addition to that, I was provided with a videotape, and I don't know who provided it to me, but it was left in chambers, and I have reviewed a pretty long videotape that was of the hotel scene, or motel, whatever it was. I have looked at all of that. I did find it very hard to decipher the words, but I did watch and listen to the entire thing. I have reviewed all the transcripts in this case that you all have provided to me. I have read them in Spanish, just to make sure that I am totally understanding the exchange; and I recognize as we proceed here that we have a number of issues.

This is the type of case that requires reliance on the evidence that was introduced at the trial. The key issues in this case are whether Mr. Diaz should be sentenced on the five k., five kilograms, or whether he should be sentenced pursuant to two kilograms. I have done some independent research on that issue, but mostly find that this is a factual issue. Because of that the transcripts were extremely important, and I must

- 19 -

say that I would have reviewed the transcripts again, even had I been the trial judge, to make sure that my recollection was accurate with regard to what amounts were being discussed and what amount was ultimately agreed upon. There are other issues in this case, but basically the key one, the one that affects Mr. Diaz the most, is the determination as to the amount in issue.

As a result of the objection, the enhancement because of the prior drug offense was not addressed or imposed by Probation in the PSR, so there is a question as to the effect of that, and that, of course, depends on the amount that we decide.

There is also the question of whether, in the motion for downward departure, the Court should depart downward, based upon a number of factors, and they are diminished capacity, sentencing entrapment, and acceptance of responsibility. I think those are all the issues that you raised. Is that right, Ms. Gardner?

MS. GARDNER: Yes, Your Honor, that is correct.

Rec. vol. VII, at 3, 11-12.

Mr. Diaz's contention that the court was not familiar with the complete record is disingenuous, to be charitable. Moreover, Mr. Diaz cites no case requiring a sentencing judge to read parts of the record that were not relevant to sentencing and not provided by the parties, nor any rule requiring a sentencing judge to certify her familiarity with the record. Cf. Fed. R. Crim. P. 25(b) (indicating that – unlike Fed. R. Crim. P. 25(a) – no explicit certification of familiarity with the record is required after a verdict or finding of guilt has been rendered: "If by reason of absence . . . the judge before whom the defendant has been tried is unable to perform the duties to be performed by the court after a

- 20 -

verdict or finding of guilt, any other judge regularly sitting in or assigned to the court may perform those duties. . . .").

Indeed, this record shows that the sentencing judge carefully reviewed the materials before the court, in fact partially agreeing with Mr. Diaz and rejecting the government's argument the proper sentencing amount was five kilograms, instead adopting his argument that the proper amount was only two kilograms. See Rec. vol. VII, at 41-44. Thus, quite to the contrary of Mr. Diaz's position, this hearing reflected assiduous efforts on the part of the court to prepare for sentencing. We see no error.

Second, Mr. Diaz argues that the district court misunderstood its ability to downwardly depart based upon his entrapment defense. "[A] discretionary decision not to depart downward is not reviewable unless the record shows that the district court erroneously believed that the Guidelines did not permit a departure." United States v. Banta, 127 F.3d 982, 983 n.1 (10th Cir. 1997). We review legal conclusions de novo, while factual determinations are reviewed for clear error. See United States v. Bolden, 132 F.3d 1353, 1355 (10th Cir. 1997), cert. denied, 118 S. Ct. 1686 (1998).

We agree with the government that we do not have jurisdiction to review the judge's discretionary decision. Judge Vazquez made very clear findings that Mr. Diaz was responsible for the two kilograms for which he was sentenced, rejecting the government's argument that he should have been sentenced for five

- 21 -

kilograms.  She stated:

> I do not believe that there was any sentencing entrapment with regard to the two kilograms that were involved here, and I think that the language that has been provided in the exhibits expresses by the defendant a willingness. He is urging, he is attempting to persuade, using prior dealing, to persuade the Government agents that he knows what he's doing, that he has been involved in this kind of thing before, that he has contacts and he moves drugs, drugs that he got from Oregon, from Las Vegas, Nevada, and I don't remember where else, but he identified the places from which he has received drugs, in an effort to persuade them that he knows what he's doing, he can be trusted.  He even offers for the agents to go to Portland, Oregon with him.  All of theses factual issues I think point to the opposite direction, rather than sentencing entrapment.

Rec. vol. VII, at 46.

Mr. Diaz argues that the court erroneously concluded that it did not have the authority to depart based upon sentencing entrapment or upon diminished mental capacity.  But the court clearly found that there was no sentencing entrapment with regard to the two kilogram amount, and it therefore could not sentence Mr. Diaz below the minimum sentence mandated by 21 U.S.C. § 841(b)(1)(B).  Thus the court's decision not to depart downward was based on a proper assessment of the evidence in the record rather than on a misapprehension of its authority.

## CONCLUSION

For the reasons stated above, we affirm the judgment and sentence of the district court.