**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 5, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID LAWRENCE KRUEGER,

Defendant - Appellant.

No. 19-2052
(D.C. No. 1:17-CR-01549-JAP-1)
(D. New Mexico)

_____

**ORDER AND JUDGMENT***
_____

Before **BRISCOE**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

After David Lawrence Krueger pleaded guilty to two counts of being a felon in

possession of a firearm, the district court sentenced him to a 120-month term of

imprisonment on each count, with the sentences to run concurrently. Mr. Krueger

objected that the United States had engaged in sentence factor manipulation by luring

him into selling six firearms to an undercover federal agent, including two sawed-off

shotguns and a firearm with an obliterated serial number. The district court overruled

Mr. Krueger's objection.

---

* This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Mr. Krueger appeals his sentence, arguing that a downward departure was warranted under the United States Sentencing Guidelines (the "Guidelines") due to sentence factor manipulation. He also argues that his 120-month sentence is substantively unreasonable. Because Mr. Krueger has not shown that the United States engaged in sentence factor manipulation and because the district court did not abuse its discretion in imposing a 120-month sentence, we affirm.

## I.  BACKGROUND

### A.  *Factual History*

On January 22, 2017, a confidential informant told Erik Rutland—an undercover special agent at the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")—that Mr. Krueger was looking to sell "a 32 Beretta, a 22 Beretta, a 12 Gauge Winchester and a .22 rifle that looked like a machine gun." ROA, Vol. II at 12. The confidential informant also told Agent Rutland "that Mr. Krueger was using methamphetamine on a daily basis and that he was pretty strung out." ROA, Vol. IV at 42. The confidential informant knew Mr. Krueger through "work in the oil fields," and through the confidential informant's brother, who owned a tire shop in Farmington, New Mexico, where Mr. Krueger was living. ROA, Vol. IV at 41.

Agent Rutland had worked with this confidential informant on several prior occasions and attested to the confidential informant's reliability. ATF had an arrangement whereby it would pay the confidential informant for information about firearms and narcotics sales in the Farmington, New Mexico, area. But, pursuant to a

2

signed agreement, if ATF caught the confidential informant selling or illegally possessing firearms, it would terminate the arrangement.[1]

The confidential informant notified Agent Rutland that Mr. Krueger had firearms for sale in Farmington, New Mexico. Agent Rutland subsequently offered $400 for each gun if Mr. Krueger would deliver the firearms to Cuba, New Mexico. Mr. Krueger agreed to do so.

On January 25, 2017, ATF agents searched the confidential informant's car to verify it did not contain any weapons and then placed a GPS tracking device on the vehicle. The confidential informant next picked up Mr. Krueger at the tire shop, helped load the weapons into the car, and the two of them drove together to Cuba, New Mexico. Agent Rutland met Mr. Krueger and the confidential informant in Cuba and purchased four firearms for $1,600.[2]

Later the same day, the confidential informant contacted Agent Rutland about purchasing additional firearms from Mr. Krueger.[3] The confidential informant sent

---

[1] Agent Rutland testified that, if he had suspected the confidential informant was using Mr. Krueger as a middleman, he "probably would have gone through with the sale but got rid of the investigation and terminated the informant." ROA, Vol. IV at 62.

[2] Agent Rutland later testified that—based on his experience doing approximately 400 similar deals—it did not appear Mr. Krueger was selling firearms on behalf of the confidential informant. Specifically, Agent Rutland testified that, if the confidential informant was "in on it," Mr. Krueger would have consulted with the confidential informant about the terms of the deal sometime during the January 25, 2017, transaction. ROA, Vol. IV at 49.

[3] Agent Rutland several times testified that the confidential informant reached out to arrange a second transaction on January 24, 2017. But he also testified that the

3

Agent Rutland pictures of a sawed-off shotgun and a second shotgun with a sawed-off stock and an intact barrel.

On February 1, 2017, Agent Rutland met Mr. Krueger and the confidential informant at the tire shop to purchase the two sawed-off shotguns. Agent Rutland and Mr. Krueger negotiated over the price of the shotguns, with Mr. Krueger promising that "he would make [Agent Rutland] a great deal next time." ROA, Vol. IV at 53. They eventually settled on a price of $350 per shotgun. One of the shotguns had an obliterated serial number. Agent Rutland complimented the sawed-off barrel on one of the shotguns and asked if Mr. Krueger had done the modification himself. Mr. Krueger answered, "No." ROA, Vol. IV at 54. Agent Rutland also inquired about purchasing an additional firearm that he suspected Mr. Krueger had in his possession, but Mr. Krueger declined, stating he does not like "being naked." ROA, Vol. IV at 56. Mr. Krueger further stated "he was going to go back to Oklahoma and [would] potentially get more firearms to sell." ROA, Vol. IV at 56. Throughout the transaction, the confidential informant was "just standing there observing." ROA, Vol. IV at 54.

ATF never ascertained where Mr. Krueger obtained the six firearms he sold to Agent Rutland.

---

confidential informant made contact "after the first undercover transaction, later on in that day." ROA, Vol. IV at 51. We assume Agent Rutland meant to say January 25, not January 24.

## B. *Procedural History*

On June 13, 2017, a grand jury indicted Mr. Krueger on two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On March 14, 2018, Mr. Krueger pleaded guilty to both counts in the indictment pursuant to a plea agreement. In that plea agreement, Mr. Krueger admitted to the following:

> On January 25, 2017, in Sandoval County, in the District of New Mexico, I, David Lawrence Krueger, having been convicted of robbery with a firearm, possession of a stolen vehicle, aggravated robbery, uttering two or more bogus checks exceeding $500, uttering a forged instrument, and domestic abuse: assault and battery (2nd or subsequent offense), all felony crimes punishable by imprisonment for a term exceeding one year, knowingly possessed four firearms which I gave to an undercover ATF agent in exchange for $1600. Specifically, I possessed a German Sports Gun GSG-5 model .22LR caliber rifle bearing serial number A279283, a Beretta 3032 Tomcat model .32 auto caliber pistol bearing serial number DAA088229, a Beretta 21A model .22LR caliber pistol bearing serial number DAA355608, and a Winchester model 1300 Defender 12-gauge pump-action shotgun bearing serial number L1935879. All four firearms functioned as designed, and met the federal definition of a firearm. None of these firearms were manufactured in New Mexico. I knew I was not legally allowed to possess firearms.

> On February 1, 2017, in San Juan County, in the District of New Mexico, I, David Lawrence Krueger, having been convicted of robbery with a firearm, possession of a stolen vehicle, aggravated robbery, uttering two or more bogus checks exceeding $500, uttering a forged instrument, and domestic abuse: assault and battery (2nd or subsequent offense), all felony crimes punishable by imprisonment for a term exceeding one year, knowingly possessed two firearms which I gave to an undercover ATF agent in exchange for $700. Specifically, I possessed a Winchester model 1300XTR 20-gauge weapon-made-from-a-shotgun with an obliterated serial number, and a Forehand Arms Company single-shot 12-gauge weapon-made-from-a-shotgun bearing serial number 109465. Both of these firearms functioned as designed, and met the federal definition of a firearm. Neither of these firearms were manufactured in New Mexico. I knew I was not legally allowed to possess firearms.

ROA, Vol. I at 30–31. The United States agreed to recommend a 2-level decrease in Mr. Krueger's offense level for his acceptance of personal responsibility.

The United States Probation Office prepared a presentence investigation report ("PSR") that calculated the base offense level as 26. The PSR then added a 2-level enhancement because the offense involved six firearms; another 2-level enhancement because the offense involved two sawed-off shotguns; and a 4-level enhancement because at least one of the firearms had an altered or obliterated serial number. Even though these enhancements mathematically yielded a total offense level of 34, the PSR stopped adding additional levels at 29, the cumulative maximum under the applicable Guidelines provision. *See* U.S.S.G. § 2K2.1(b). The PSR then subtracted 2 levels for acceptance of responsibility and 1 level because Mr. Krueger pleaded guilty. These adjustments yielded a total offense level of 26.

The PSR further calculated Mr. Krueger's criminal history category as VI. With a total offense level of 26 and a criminal history category of VI, the PSR calculated Mr. Krueger's Guidelines imprisonment range as 120 to 150 months.

Mr. Krueger objected to the PSR, arguing that he neither supplied nor modified any of the firearms. Instead, he claimed the confidential informant supplied the firearms and Mr. Krueger acted merely as a middleman. To apply a sentencing enhancement based on the characteristics of the firearms, he argued, would therefore amount to sentence factor manipulation. In the alternative, Mr. Krueger asked the district court to "depart or vary to a sentence of 84 months based on an offense level

6

of 23 and a criminal history category of VI."[4] ROA, Vol. I at 46. The United States requested the statutory maximum sentence of 120 months.[5]

At a hearing on January 30, 2019, the district court overruled Mr. Krueger's written objection and adopted the factual statements in the PSR as its findings of fact. The district court then sentenced Mr. Krueger to 120-month terms of imprisonment on each of the two counts, to run concurrently, followed by a 3-year term of supervised release.

Mr. Krueger objected, alleging the district court had ignored his claim of sentence factor manipulation and had instead treated the Guidelines enhancements as "strict liability." ROA, Vol. IV at 31. In response, the district court announced that it would "retract" its previously announced sentence and would instead hold an evidentiary hearing. ROA, Vol. IV at 33.

At that evidentiary hearing, Agent Rutland testified about the events leading to Mr. Krueger's arrest. The district court also admitted into evidence two videos of the firearms transactions that corroborate Agent Rutland's testimony.

At the conclusion of Agent Rutland's testimony, Mr. Krueger argued that one could reasonably infer the confidential informant, not Mr. Krueger, had supplied the

---

[4] An offense level of 23 and a criminal history category of VI yield a Guidelines range of 92 to 115 months. *See* U.S.S.G. Ch. 5, Pt. A. At sentencing, Mr. Krueger ultimately requested a 92-month sentence.

[5] The United States later orally requested "the maximum that the court is able to give" based on Mr. Krueger's "incredible" criminal history. ROA, Vol. IV at 24, 26.

six firearms. The district court disagreed and overruled Mr. Krueger's objection, thereby readopting the PSR's calculated offense level of 26. The district court then sentenced Mr. Krueger to 120 months' imprisonment on each count, to run concurrently. Mr. Krueger renewed his prior objections.

The district court entered judgment on March 21, 2019. Mr. Krueger timely filed a notice of appeal on March 26, 2019.

## II. DISCUSSION

Mr. Krueger argues the Guidelines sentence enhancements for possessing six firearms, a sawed-off shotgun, and a firearm with an obliterated serial number were all the product of sentence factor manipulation because the confidential informant supplied the guns. He secondarily argues that his sentence is substantively unreasonable. We disagree with both of Mr. Krueger's arguments, but before we address the merits, we must first assure ourselves of our jurisdiction to hear his appeal.

### A. Jurisdiction

The United States argues we lack jurisdiction to entertain Mr. Krueger's arguments because Congress has not provided us with the power to review a district court's discretionary denial of a downward departure from the Guidelines range. We agree with the basic premise of the Government's argument but disagree with its characterization of Mr. Krueger's argument. To place our analysis in context, we begin with a discussion of our statutory jurisdiction and then address our decisions implementing that statute.

8

Congress has provided that a criminal defendant may appeal and that we have jurisdiction to review a sentence that "(1) was imposed in violation of law; (2) was imposed as a result of an incorrect application of the sentencing guidelines; . . . (3) is greater than the sentence specified in the applicable guideline range . . . ; or (4) was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable." 18 U.S.C. § 3742(a). The government is correct that nothing in this statute provides us with the power to review a district court's purely discretionary decision not to depart downward. *See, e.g.*, *United States v. Davis*, 900 F.2d 1524, 1530 (10th Cir. 1990) ("In short, when a sentence is within the guideline range and is not imposed in violation of law, or as a result of an incorrect application of the guidelines, then the district court's refusal to exercise its discretion to depart downward from the guideline range is not appealable." (footnotes omitted)); *see also United States v. Penuelas-Gutierrez*, 774 F. App'x 493, 495–96 (10th Cir. 2019) (unpublished) ("Congress did not grant appellate jurisdiction for refusals to depart downward." (quotation marks omitted)); *United States v. Sierra-Castillo*, 405 F.3d 932, 936–37 (10th Cir. 2005) (stating same rule).

In *United States v. Lacey*, 86 F.3d 956 (10th Cir. 1996), however, we held that we do have jurisdiction to consider sentence factor manipulation. There, we explained:

> The government argues that this Court lacks jurisdiction to review a discretionary refusal to depart below the sentencing guidelines. While the government is correct that we will not review a district court's *discretionary* choice not to depart downward, . . . there is no similar impediment to appellate review where a sentence is imposed (as Lacey

9

argues) in violation of law, or as a result of an incorrect application of the guidelines.

*Id.* at 962 n.2 (citation omitted).

In so holding, we described sentence factor manipulation as a subspecies of the outrageous conduct defense typically associated with entrapment. *See id.* at 963 & n.5. The outrageous conduct defense, we further explained, is grounded in "due process principles." *Id.* at 964 (quoting *United States v. Russell*, 411 U.S. 423, 431 (1973)). In short, a sentence that violates due process principles is a sentence imposed in violation of law over which we have jurisdiction. *See* 18 U.S.C. § 3742(a)(1) (providing that a criminal defendant may appeal a sentence that "was imposed in violation of law").

The United States unconvincingly argues that our decision in *Lacey* is inconsistent with our later decision in *United States v. Diaz*, 189 F.3d 1239 (10th Cir. 1999). In *Diaz*, the defendant argued "that the district court misunderstood its ability to downwardly depart based upon [the defendant's] entrapment defense." *Id.* at 1250. We rejected the defendant's argument, explaining that the district court's decision "not to depart downward was based on a proper assessment of the evidence in the record rather than on a misapprehension of its authority." *Id.* at 1251. There, "the [district] court clearly found that there was no sentencing entrapment . . . , and it therefore could not sentence [the defendant] below the minimum sentence mandated by [statute]." *Id.* at 1251. But we also stated that a "discretionary decision not to depart downward is not reviewable unless the record shows that the district court

10

erroneously believed that the Guidelines did not permit a departure." *Id.* at 1250 (quotation marks omitted).

Although the general proposition stated in *Diaz* may be too narrow, nothing in the decision purported to overrule *Lacey*'s jurisdictional holding. Instead, the panel in *Diaz* properly considered the defendant's argument that the sentence "was imposed as a result of an incorrect application of the sentencing guidelines." *See* 18 U.S.C. § 3742(a)(2). That is, Diaz argued the district court did not understand that it had the discretion to depart downward. The panel properly considered that argument on the merits, concluding the district court was aware of its discretion under the Guidelines. It then correctly determined it lacked jurisdiction to review the district court's decision not to exercise its discretion to depart downward. Thus, nothing in *Diaz* calls into question the similar approach followed in *Lacey*.

The United States also points to *United States v. Lyday*, No. 97-5147, 1998 WL 764688 (10th Cir. Oct. 30, 1998) (unpublished), as supportive of its position that we lack jurisdiction here. In *Lyday*, as in *Lacey*, we reviewed the merits of the defendant's sentence factor manipulation argument. *Id.* at *4 ("We agree with the district court that Lyday has failed to present facts sufficient to justify a departure based on sentencing entrapment."). And, as in *Diaz*, the panel considered but rejected the defendant's argument that "the district court did not understand it had the ability to grant a downward departure based on the alleged sentencing entrapment." *Id.* at *3. Upon rejecting the two claims over which it had jurisdiction under 18 U.S.C. § 3742(a)(1) & (2), the panel dismissed the challenge to the district court's refusal to

11

depart downward for lack of jurisdiction. *Id.* at *4. Thus, as in *Lacey* and *Diaz*, we reviewed only the arguments over which we had statutory jurisdiction, dismissing the challenge to the district court's refusal to exercise its discretion to depart downward for lack of jurisdiction.

Under *Lacey* and *Diaz* we may review sentence factor manipulation arguments that fall within our statutory jurisdiction. But upon concluding that any such argument is specious, we have no jurisdiction to review the district court's exercise of its discretion to deny a downward departure.

Here, Mr. Krueger contends his sentence was imposed in violation of law because the government engaged in sentence factor manipulation. We have jurisdiction to review this argument as a purported violation of law. But because, as we now explain, the district court properly rejected that argument, we lack jurisdiction to review its decision not to depart downward from the Guidelines sentencing range.

### B. Merits

**1. The Enhancements Applied to Calculate Mr. Krueger's Guidelines Range Were Not the Product of Sentence Factor Manipulation.**

In an appeal from a district court's refusal to grant a downward departure based on sentence factor manipulation, "we review the district court's factual findings for clear error, and its legal determinations de novo." *United States v. Garcia*, 411 F.3d 1173, 1181 (10th Cir. 2005). We ask "whether, considering the totality of the circumstances . . . the government's conduct is so shocking, outrageous

12

and intolerable that it offends the universal sense of justice." *Id.* (alteration in original) (internal quotation marks omitted). To prevail, "the defendant must show either (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime." *Id.* (quotation marks omitted).

Nothing that Agent Rutland did to set up or complete the two firearms purchases was shocking, outrageous, or intolerable. In fact, Mr. Krueger has not pointed to any evidence that suggests excessive government involvement or significant governmental coercion.

Instead, Mr. Krueger bases his argument for a downward departure on three flawed premises. First, he argues that the confidential informant—by not supplying Mr. Krueger with a sawed-off shotgun prior to January 25, 2017—"forced there to be a second buy." Appellant Br. at 13. To the contrary, no one forced Mr. Krueger to sell Agent Rutland additional firearms on February 1, 2017. And to the extent Agent Rutland had enough evidence to conclude his investigation after the January 25, 2017 sale, he was not required to do so. "As a general matter, the government may need to complete several transactions with a defendant during the course of an undercover operation because [a]n undercover agent cannot always predict what information he will learn in the course of his investigation." *United States v. Scull*, 321 F.3d 1270, 1277 (10th Cir. 2003) (alteration in original) (internal quotation marks omitted).

Second, Mr. Krueger argues that the confidential informant "provided Mr. Krueger with sawed-off shotguns expressly for the purpose of selling them to

13

Agent Rutland." Appellant Br. at 13. No evidence supports this assertion. Agent Rutland testified that he did not believe Mr. Krueger was selling firearms on behalf of the confidential informant—based both on his experience with the confidential informant and on the fact that Mr. Krueger never consulted with the confidential informant about price or other matters during either transaction. Agent Rutland also testified that the confidential informant signed an agreement with ATF prohibiting the informant from selling firearms. And the evidence at the hearing revealed that ATF agents saw no firearms in the confidential informant's vehicle before the confidential informant picked up Mr. Krueger at the tire shop. Based on this record, we cannot conclude the district court clearly erred in finding Mr. Krueger supplied the weapons.

Third, Mr. Krueger asserts "he had no knowledge" of one firearm's obliterated serial number. Appellant Br. at 13. Yet he also acknowledges, correctly, that U.S.S.G. § 2K2.1(b) does not require such knowledge to impose the enhancement. *See United States v. Sanders*, 990 F.2d 582, 584 (10th Cir. 1993). Thus, Mr. Krueger has failed to demonstrate sentence factor manipulation justifying a downward departure.

## 2. A 120-Month Sentence is Substantively Reasonable.

Mr. Krueger next argues it was error for the district court to deny his request for a variance because the various Guidelines enhancements applied to his offense conduct do not reflect his degree of culpability. Because the district court did not abuse its broad sentencing discretion, we affirm Mr. Krueger's 120-month sentence.

"This court reviews a district court's decision to grant or deny a request for variance under a deferential abuse of discretion standard." *United States v. Beltran*, 571 F.3d 1013, 1018 (10th Cir. 2009). "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *Id.* (internal quotation marks omitted). "When the district court's sentence falls within the properly calculated [G]uideline[s] range, this Court must apply a rebuttable presumption that the sentence is reasonable." *Id.* "The presumption of reasonableness is, however, a deferential standard [the defendant] may rebut by demonstrating that the sentence is unreasonable when viewed against the other factors delineated in [18 U.S.C.] § 3553(a)." *Id.* (first alteration in original) (internal quotation marks omitted).

The district court imposed a sentence of 120 months' imprisonment, a sentence at the low end of the applicable Guidelines range. The district court agreed with the Guidelines calculations in the PSR, considered the § 3553 factors, and adopted the PSR's proposed factual findings, including its summary of Mr. Krueger's extensive criminal history. Under these circumstances, the district court did not abuse its discretion in denying Mr. Krueger's request for a variance.

Mr. Krueger's brief asks us to focus on his lack of individual "culpability," but the substance of his argument is a critique of strict liability Guidelines enhancements. That is, he objects to the fact his sentence can be increased based on characteristics of the guns he claims not to have known. Appellant Br. at 16–19. As such, Mr. Krueger's argument only tangentially implicates the district court's assessment

15

of the § 3553 factors. As we explained in *United States v. Wireman*, 849 F.3d 956 (10th Cir. 2017), "we have never held that the district court must explain away or otherwise justify any perceived deficiencies that [a] particular Guideline may have." *Id.* at 964. Rather, the district court's endorsement of the PSR's Guidelines calculation "acted as a functional rejection of [Mr. Krueger's] policy disagreements with" the three enhancements. *Id.* at 966. Out of an abundance of caution, we nevertheless address Mr. Krueger's policy arguments to ensure that "the district court did not err by not explicitly responding to [Mr. Krueger's] arguments for a more lenient sentence." *Id.*

Mr. Krueger first argues that U.S.S.G. § 2K2.1(b)—by not requiring a defendant to know a firearm's relevant characteristics—imposes enhancements that divorce culpability from punishment. But his argument is foreclosed by our precedents. Specifically, in *Sanders*, we rejected a due process challenge to a strict liability Guidelines enhancement for possession of a stolen firearm because sentencing enhancements are entirely different from the elements required to obtain a conviction. 990 F.2d at 584. For that same reason, the Guidelines may, consistent with due process and § 3553(a), apply an enhancement for possession of a sawed-off shotgun, a weapon "not typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008).

Mr. Krueger next argues that U.S.S.G. § 2K2.1(b) is inconsistent with 18 U.S.C. § 922(j), a statute that makes it a crime to possess "any stolen firearm." As the Ninth Circuit recently explained, however, the two provisions are "fundamentally

16

different, and we cannot assume that Congress intended to include an unwritten mens rea for the Guidelines enhancement because it included a written one for the statutory offense." *United States v. Prien-Pinto*, 917 F.3d 1155, 1160 (9th Cir. 2019).[6] The district court correctly found each Guidelines enhancement identified in the PSR applied to Mr. Krueger's offense conduct and reasonably applied the § 3553 factors. It therefore did not abuse its discretion by denying Mr. Krueger's request for a variance.

## III.    CONCLUSION

Because Mr. Krueger has not shown that the United States engaged in sentence factor manipulation, and because the sentence imposed is substantively reasonable, we **AFFIRM** Mr. Krueger's sentence. And we **DISMISS** Mr. Krueger's challenge to the district court's denial of his request for a downward departure for lack of subject matter jurisdiction.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

---

[6] Mr. Krueger relies on the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019). *Rehaif* addressed the mens rea required to violate the crime defined by 18 U.S.C. § 922(g) but did not mention the Guidelines. Here, Mr. Krueger admitted in his plea agreement he possessed the required mens rea to violate § 922(g).